In re FRANKLIN PARK DEVELOP-
MENT I, Franklin Park
Development II, Debtors.

Bankruptcy Nos. 86–721–HL,
86–722–HL.

United States Bankruptcy Court,
D. Massachusetts.

Aug. 12, 1986.

Joseph Ackerstein, Office of the U.S. Atty., Boston, Mass., for U.S.

John F. Blanchon, Dept. of Inspectional Services, Boston, Mass.

John F. Cullen, (Cullen & O'Connell), Boston, Mass., Trustee.

Kurt Dettman, Boston, Mass., for Denise Boger.

Ellen P. Dole, Robert H. Farrell, Boston, Mass., for HUD.

Virginia Greiman, Gerard F. Kelley, Office of the U.S. Trustee, Boston Federal Office Building, John D. Hanify, Harold Murphy, Hanify & King, Boston, Mass., Trustee.

Frank Kirby, Boston, Mass., for Arrington Group.

Robert Bowens, Daniel S. Manning, Boston, Mass., for tenants.

Joseph S. Mitchell, III, McCabe/Gordon, Boston, Mass., for Creditors' Committee.

Francis X. O'Brien, Roxbury, Mass., for Boston Gas.

John F. Palmer, Boston, Mass., for Wrenn Management.

Vincent J. Pisegna, Looney & Grossman, Boston, Mass., for debtor.

Lewis A. Sassoon, Gargill, Sassoon & Rudolph, Boston, Mass., for Boston Edison.

Marcus S. Weiss, Boston, Mass., for Greater Roxbury Development Corp.

# 254

## FIRST INTERIM OPERATING MEMORANDUM

**HAROLD LAVIEN, Chief Judge.**

These two Chapter 11's were filed on May 19, 1986 by two Housing and Urban Development ("HUD") subsidized corporations owning 29 buildings containing 370 low income apartments in the Roxbury District of Boston, across from Franklin Park, and bounded by Seaver Street, Brookledge Street, Humboldt Avenue, Homestead Street, Hutchings Street, and Ruthven Street. The estates of these two debtor corporations were joined for the purpose of these bankruptcy court proceedings, on July 10, 1986, pursuant to Bankruptcy Rule 1015(b). The stock in the debtors is owned by the Greater Roxbury Development Corporation, a non-profit minority enterprise that purchased the properties in 1979 with HUD financing.

The Chapter 11's were filed when HUD finally decided the properties had degenerated to a condition unfit for human habitation and applied the draconian solution of terminating the rental subsidies. This imaginative solution to years of neglect compelled the filing of the Chapter 11's. The basis of HUD's refusal was that the condition of the individual units failed to meet standards required of properties subsidized by HUD, and that HUD was prevented by its own regulations from remitting rent subsidies to the debtor corporations.

Initially, all of the parties except HUD desired a trustee as a means of restoring the subsidies, and this was ordered by the Court on a temporary basis at a hearing on July 6th.

HUD wanted to be able to foreclose and take back the properties with the intent of rehabilitating them and re-selling them to a new operator with the incidental result of getting rid of the debtors and the approximate $600,000 of creditors in the process. Initially, the Court leaned to this as, possibly, the best route if the needs of the tenants were to be paramount. However, I have second thoughts after viewing the adjoining properties repossessed by HUD approximately three years ago, which stand boarded up and looking worse than the debtor's property. HUD spent, literally, millions of dollars on the debtor's properties and turned an unseeing eye to deteriorating conditions while accepting from the debtor, month after month, certification that the units were fit for human occupancy.

The United States Trustee, almost immediately, sought to end the trusteeship and dismiss the petitions, feeling that the unfunded trustee could not be asked to assume the responsibility and seemingly unlimited liability of these degenerated buildings unless protected by insurance.

A hearing was held on July 10th, at which time it became apparent that HUD had failed to abide by its own notification requirements, under 24 C.F.R. § 886.320 pursuant to which it must notify the owner of its intentions to abate rental subsidies 30 days before it takes such action. The result of the hearing was an order authorizing the appointment of a trustee, and ordering HUD to make a single subsidy payment to the trustee. The trustee was to use these funds to obtain insurance for himself and the project, and to provide for the immediate health and safety needs of the tenants, and to report at a continued hearing on August 8. John F. Cullen was appointed trustee by the U.S. Trustee and assumed his duties on July 18th. After some initial confusion and delay, HUD turned over a one-month rental subsidy of $298,200 to the trustee.

On August 5th, on motion by the trustee, the Court took a view of the properties. Also present were the trustee, U.S. Trustee, HUD, the tenants, the debtors, and the utilities, all represented by counsel.

On August 7th, the hearing resumed with all of the parties represented by at least one attorney—in total, there were 19 attornies present. The scheduled matters for consideration by the Court were as follows: United States Trustee's Motion to Dismiss; Renewed Motion of Denise Boger to Modify Stay and Permit Prosecution

Pending Suit; Motion of the Debtors to Compel HUD to Make Subsidy Payments; Motion to Appoint a Committee of Tenants; Verified Emergency Motion of the Unofficial Tenant's Committee to Allow Surveys to Proceed Unimpeded; Motion by Boston Gas and Boston Edison to Compel Payment of Deposit and Current Outstanding Bill. Also filed for the Court's consideration were (1) an extensive report by the trustee, (2) a Plan of Reorganization proposed by a third-party corporation to be implemented jointly with the debtor corporations, (3) a report from a consulting firm employed by the Unofficial Tenant's Committee, (4) and a brief filed by trustee's counsel, addressing the claim by HUD that certain provisions within its loan agreement with the debtor corporation forbade prepayment of the loan without prior agency approval and, even then, only to a limited amount.

The potential affect of these restrictions outlined in the brief submitted by trustee's counsel are far reaching. If found valid, they would inevitably diminish the value and marketability of the property. Even in its present condition, the property is valued by HUD at approximately $5,000 per apartment and by the trustee at $40,000, depending in part on the validity of HUD's restrictions. There would appear to be substantial equity with which to finance a rehabilitating reorganization of the property, since HUD's guaranteed loans and assigned mortgages approximate $1,500,000, and this property might have a value of near to $9,000,000. What is unclear, is whether the estate could reject or prepay its HUD loan as an executory contract, pursuant to 11 U.S.C. § 365, and remain qualified for low rent tenant subsidies either through HUD or a state agency.

After reading all of the pleadings submitted for consideration at the August 7th hearing, and listening to the oral argument of counsel, the Court reached the following decision.

The conclusion seems to me inescapable that our present housing policy is bankrupt and that reorganization is years late.

Housing is desperately needed, and HUD provides the funds but not the hands-on control to see to proper rehabilitation and management. At the present time, unfortunately and despite the best intentions, HUD's initials might stand for "Have Urban Disaster." The policy sounds reasonable: provide a developer with funds or a nonprofit or minority group to buy, rehabilitate, and create subsidized low-cost housing.

One need only look at the buildings in and surrounding the Franklin Park Development to see its failure. Aside from the one Boston Redevelopment Association (BRA) unit, which appeared well maintained, the other property on the block is owned entirely by the debtors and HUD. Actually, the condition of the property taken by HUD through foreclosure is in such a devastated condition that the debtors' property looks good by contrast. For example, one building owned by HUD has stood as a shell for seven years—its only inhabitant, a tree growing out from its unroofed top. HUD is finally making efforts to demolish the building; otherwise, it is apt to collapse and hurt or kill someone. Other buildings owned by HUD were patched with boarded-up windows and entrances, some boards removed in spaces where, it was apparent, squatters resided. Other properties in the neighborhood, presently or previously run by the same nonprofit corporation that owns these debtors, seem to be in similarly poor condition. By contrast, the neighborhood has well maintained, owner-occupied properties in what can be and should be a choice location, in Boston.

So far, I've said nothing explicit about the conditions that I saw on the View of August 5th, because I still have trouble believing that as a nation, in 1986, we are concerned with an assortment of sophisticated national and international issues and, yet, still allow our fellow human beings to live in filth and substandard housing. Had the conditions of the Franklin Park Development been viewed in a third-

world country, they would have raised sympathetic outcries.

The condition of the developments have to be seen to understand why I left them feeling angry with all who shared in this degradation of their fellow human beings; outrage at government agencies that allowed it; but, most of all, ashamed of myself for being so willing to ignore the rape of our future.

Cry, not only for the tenants. Tenants, or more accurately described as prisoners, first, of the economics that made these buildings their only available shelter and, then, of the drug pushers, muggers, and you name the vermin—two-and-four legged—that hold them captive. In less than a month, since the trustee increased police surveillance, nearly 100 arrests have taken place.

In one apartment, an iron basin of dirty water caught my eye. Surprisingly, this was below an area of the ceiling that did not seem to have a leak. I asked the little boy whose home it was, why the basin was in the middle of the kitchen floor. He said, "Oh, that's where we have to take our baths." Imagine, a tub, used as a bathtub, in 1986, in Boston!

But, cry not only for them. Cry for us and our children. What respect for law or anything we hold sacred as a society can we expect by the next generation of this development who receive the daily message from their life in this community that drug pushers are in control and society is content to abandon them? What message do these children receive from the rest of society, so long as we allow them to live in this boarded-up, hot-waterless, heatless jungle of falling plaster and non-functioning toilets? This is not a question of charity, but enlightened self interest. How long can we expect victims to remain passive and limited to their own turf?

Franklin Park needs only one zoo. This Court has no control over the general economics of the tenants, but it can and will affect their living conditions.

The trustee seems to have introduced the only hope in this sordid situation. He has the confidence and cooperation of the city building commissioner, the police and the fire departments. Perhaps, he is even beginning to light a dim ray of hope in the people who are trying to exist there. Already, one building, condemned as unsafe, is being completely rehabilitated, with the tenants expected to move back in a week or two. Imagine, that for the first time, the tenants of this building have such luxuries as a structurally-sound building. Previously, one floor was caving in on the apartment below. Now, they will have fancy items such as locks on the doors, glass in the windows, mailboxes, heat, toilets that work, and a kitchen with basic appliances. In another building, over a hundred tenants will, for the first time, have adequate hot-water heaters. However, unless a new boiler is installed, that building will, again, have no heat this winter.

In less than a month, the trustee has let contracts and has had the work accomplished. Dare anyone suggest that we revert to words, pious phrases and previous neglect? The trustee has illustrated what can be done and what will be done.

■ I am, therefore, going to continue the trustee, as the prospect of returning the properties to HUD or the debtors would only be like the tenants using a speedboat to cross the River Styx. I wish that I could order HUD to provide substantial funds to aid the trustee. I would hope that they, themselves, would see the wisdom of finding a way to cut red tape in order to speed up the over-delayed process. But, in any event, the rental subsidies are to continue to be paid to the trustee, who should arrange for collecting the rents that should be paid by the tenants.

It is also clear, from the tenants' expression of interest and from the fine state of the owner-occupied properties in the Franklin Park area, in some cases abutting these devastated buildings, that a tenant sense of participation is necessary. Accordingly, an Official Tenants' Committee is authorized whose 11 members are to be chosen from

the present tenants' association. This Committee is to work with the trustee in inventorying the tenants and the question of rent collection. They are also to draw up a list of priority repairs and essential rehabilitation. It may be that some of the tenants have skills that could be utilized in restoring these buildings, so that they might become good places to live.

Meanwhile, the trustee, with the cooperation of all interested parties, is to try to work out, if possible, a plan for permanent tenant participation. The answer may be some innovative variant of cooperatives or condominiums, so that the tenants have a feeling of pride in their building. At this time, it seems whatever legal form the reorganized Franklin Park Development takes, debtor participation will remain necessary.

The tenants are also ordered to remit their rental payments to the trustee for all amounts withheld to date. The Court recognizes that these are low income apartments with subsidized rentals but, in most cases, I would presume that subsidy is not the equivalent of a rental substitute. If the trustee is to proceed with the funds necessary for even emergency repairs, he will need both the rent and the subsidies. Therefore, any rent that is being withheld under previous state court actions will be turned over, forthwith, to the trustee so that he can proceed with the repairs. Tenants will be expected to pay all current rent to the trustee.

This hearing is continued until September 17, 1986 at 10:30 A.M., by which time I would hope that HUD has found a way to cooperate with the trustee and provide extra funds. If not, and if they are pursuing their desire to take possession, then, by September 15th, they should submit a full, complete and detailed plan as to what repairs they are prepared to undertake and how soon they are prepared to start them.

Third-party plans should also be submitted by September 15th, detailing exactly how the repairs will be made, the source and amount of funding, and where and what will be done to maintain tenant occupancy of their present quarters.

In the meantime, the trustee, as indicated, will work with the Tenants' Committee to resolve the pressing problems that exist in the facility. HUD will continue to make the payments for the months that have not yet been paid. And, they will accept, for the time being, the same request for funds that has been made for the last acceptable month, subject to adjustment, when the time arrives for the essential certifications that will ultimately have to be made.

Regardless of religious orientation, each generation has to meet the moral challenge of Cain's disclaimer. And, unfortunately, most of us prefer to answer in the negative. Bankruptcy is a modest but sincere attempt to answer in the affirmative; that, yes—at least collectively—we are our brothers' keepers. Notice that each of our heads and hearts are located on our anatomy in loftier locations than our billfolds. This is the time and opportunity for the conscience of all of us to command our pocketbooks. I recognize that the problem is much bigger than Franklin I and II, but, let us see if we can stop talking about how terrible it is. At least HERE, let us start working toward making it better. The trustee has shown us that it can be done. And, with a little cooperation, squalid accommodations may yet be turned into homes fit for human habitation. I commend the trustee for the efforts that he has made and wish him good luck in the continuing project.